GILMER, J.
This case has been before the Court of Appeals, and is reported in 3 Grat. 77. After the case went back from that court, the plaintiffs in the Circuit Court filed a supplemental bill, for the purpose of putting in issue the title to Fanny, one of the children of Lucy, named in the original bill of sale from Turner to Rag-land ; and also that to one of her children named Lewis, born after the date of the bill of sale. The judge of the Circuit Court decreed, that Fanny and Lewis belonged to the estate of Richard Turner, and *that they should be divided with his other slaves. The appeal brings up the question of the correctness of that decree. The difference between the title set up to Lucy and the other slaves which were in controversy in the original suit, and that to Fanny and Lewis is, that Shelton Ragland, on the 1st of November, 1811, executed a paper in these words:
“I do hereby relinquish my right to a negro girl, named Fanny, to Elizabeth Turner, of the county of Caroline, for and in consideration of fort3r-five pounds, to me in hand paid.”
The first question that presents itself is, what is the true character and meaning of this paper? It is not in the common form of a bill of sale ; it does not purport upon its face to convey to Elizabeth a negro; no bargain and sale are set forth, and there is no warranty of title: but it purports to be a relinquishment by Ragland to her, of his right to the negro. The first enquiry, then, is, what was that right thus relinquished? what did Ragland part with? what did Elizabeth Turner acquire? Let the facts in the record answer the question. In October, 1806, Richard Turner, the father of the said Elizabeth, conveyed, by bill of sale, absolute on its face, the said slaves, Lucy and Fanny, to Shelton Ragland. The intention of Turner, as is proved beyond all controversy (and as the Court of Appeals decided, in 3 Grat., above referred to), was to protect his negroes from his creditors, by pretending to sell them to Ragland, under a secret trust for the benefit of his wife and children. It is also proved, beyond all doubt, that Ragland took possession of the negroes, and agreed to hold them, under the secret trust aforesaid. It is also proved that he was a man of integrity and truth, and that he regretted, after the bill of sale had been made to him by Turner, that he had permitted it to be done: he over and over again disclaimed all title to the slaves, and stated that he only held them under the trust. Soon after the bill of sale was made, the negroes were sent to Rag-land, and remained there *a few days, and it is not proved that he ever had possession of any of them afterwards — - much less is it proved that he had possession of Fanny at the time when this relinquishment was made, or that he ever delivered possession of her to Elizabeth Turner. Not only is it proved that he disclaimed title, on many occasions, to the negroes, but it is also proved that on his death-bed he solemnly did so again, in the presence of witnesses, and said he had given them up. This disclaimer applied to all the slaves in controversy, and especially to Lucy and Fanny, for they are named in the bill of sale, and, as before stated, were both, shortly after its date, returned by Ragland to Turner; it was a declaration against the interest of Ragland, and made in solemn form, and therefore should have full credit.
These are some of the circumstances by which the parties were surrounded when this transaction took place, and they are sufficient to show what claim Ragland set up to Fanny when he executed the paper relinquishing his right to her to Elizabeth Turner. He had nominally, it is true, the legal title — what is, in common parlance, in the country, called “the right” — but he in fact only claimed to act as trustee. Fanny was at the time in possession of Mrs. Frances Turner, the widow of Richard Turner, who, under the secret trust, was entitled to all the negroes during her life, and Elizabeth, who was then quite young, and unmarried, was (so far as the proof discloses) living with her mother. My understanding of this paper is, that Ragland, wishing, most probably, to carry out some family arrangement, agreed to let Elizabeth keep Fanny, and executed the paper for the purpose of binding himself not to exercise his authority under his “right” (bill of sale), by taking her away from her; thus permitting her to hold Fanny in subordination to the trust. Rag-land had no right to sell under the secret trust: he could only have acquired the right by claiming, not under, but against it — and this, I am satisfied, he never did, or intended to do, for such an act and intention are contradicted, *not only by his declarations, but by his acts up to the time of his death. By this construction, Ragland’s conduct and declarations are consistent with each other and with his character; but they would be rendered, by the construction- contended for by the appellants, wholly irreconcilable.
Ragland held an absolute bill of sale for Lucy, and, after the death of Richard Turner, he hired her to his widow for a year, calling her, in his letter, “his negro woman, Lucy,” and yet the Court-of Appeals decided, with this evidence before it, that Lucy belonged to the estate of Richard Turner, on the ground that Ragland had admitted that he claimed under the trust. I think there is stronger ground for claiming Lucy as the property of Ragland than for claiming Fanny — -there is no more proof that he ever received the for Fanny than that he received the $10 for the hire of *543 Lucy, and I have no idea that he ever received any part of either. The bill of sale from Turner to Ragland for Lucy and Fanny is for ninety pounds, and the relinquishment by Ragland of his right to Fanny purports to be for forty-five pounds, just half that amount. The appellants here have got the full benefit of the secret trust (of which the3r express, in their answer, so much ignorance and such horror), by receiving their portion of the slaves under the division — all of which, but for the trust, would have belonged to Ragland’s estate, and it is too late now for them to set up this defence: they cannot be allowed thus to claim under and against it, to repudiate the trust as to Fanny, and to claim under it as to all the other slaves. The possession of Elizabeth Turner was (as is said in the case in 3 Grat.) the possession of one of several co-cestuis que trust, who had been, in part, at least, supported by the trust slaves. She got possession from the trustee, who claimed in that character alone, and being one of the cestuis que trust, participating in the trust fund, she must be held to have had notice of the trust.
If I am right in what has been said, the appellant *cannot be protected by the statute of limitations. I can see no principle on which the statute can be applied to bar the claim to Fanny, that would not as well have applied to bar the claim set up in the original suit to Lucy — they were conveyed at the same time, by the same bill of sale, under the same trust from Turner to Ragland, and I have already stated that Turner’s claim to Lucy was more unequivocal in its terms than that to Fanny. That claim alone would have vested the title in Ragland, had it been made against the trust, much more would the claim and his long possession, taken together; for if his claim had been adverse to the trust, as it appeared to be, Mrs. Turner’s possession of the slaves, claiming under him, would have been his possession, and was long enough to have vested the title in him by the statute; yet the Court of Appeals decided, in the former suit, that the negroes belonged to Turner’s estate. I do not think the case of Huston’s adm’r v. Cantril et ais., 11 Leigh, 136, applies to this case.
I am for affirming the decree.
CLOPTON, J.
Richard Turner, in 1806, made an absolute bill of sale for two slaves, Lucy and Fanny, to Shelton Rag-land, to protect them against the claims of creditors; but upon secret trust for the benefit of Turner’s wife during her life, and after her death for his children. Rag-land never denied the trust, or claimed any property in the slaves for his own benefit; on the contrary, a short time after the death of Richard Turner, in 1807, the slaves went into the possession of Mrs. Turner, who held them until her death, in 1834. By her will, she disposed of the slaves unequally among her children, and excluding one (Mrs. Campbell) entirely.
Campbell and wife filed their bill to establish the trust, and to obtain an equal division of the slaves. The Circuit Court established the trust, and directed the executor of Mrs. Turner to surrender the slaves to commissioners, who were appointed to divide them *equaily among the three children of Richard Turner. Upon appeal this decree was affirmed. Judge Baldwin, who delivered the opinion of the court, sajrs, in substance, that no title has been shown in Mrs. Turner by purchase from Ragland; that Ragland did not claim title for his own benefit under the bill of sale, but only as trustee for Mrs. Turner during her life, and her children after her death; which trust was partly executed during the life of Mrs. Turner by her possession, use, and enjoyment of the property. That it was not competent for the appellants to rely upon the legal title conveyed to Ragland, nor upon the possession, use, and enjoyment of Mrs. Turner, in order to defeat the full and perfect execution of the trust by an equal division of the property among all the children. That though, if Ragland had claimed title for his own benefit under the bill of sale, it would not have been competent, if it was made to defraud creditors, to set up a secret trust against his absolute title; yet, as he disclaimed all title for his own benefit, and permitted Mrs. Turner to' enjoy the property as cestui que trust, with remainder to her children, the appellants, who show no title except as co-cestuis que trust in remainder, cannot now defeat the full execution of the trust, nor appropriate the full benefit to themselves, by relying upon the fraudulent intent, with which the bill of sale may have been executed, nor avail themselves, under the circumstances of the statute of limitations.
When the case went back to the Circuit Court, a division of the slaves was directed, and upon the coming in of the report of division, Campbell and wife excepted to the report, among other reasons, because the defendant John R. Turner (who had married a daughter of Mrs. Turner), had refused to surrender the slave Fanny and her son Lewis for division. The court confirmed the division reported, and allowed the plaintiffs to file an amended and supplemental bill, to assert their claim to Fanny and Lewis. John R. Turner and wife, in their answer to this bill, assert their title to these *two slaves under a deed from Ragland to Elizabeth Turner (the wife), dated 1st of November, 1811, rely upon their long possession, and plead the statute of limitations ; they also admit that Fanny is the slave conveyed in the same deed with Lucy from Richard Turner to Ragland. The deed under which the defendants claim Fanny and Lewis is in these words:
“I do hereby relinquish my right to a girl named Fanny, to Elizabeth Turner, of the county of Caroline, for and in consideration of forty-five pounds to me in hand *544 paid. As witness my hand and seal, this 1st November, 1811.
“Shelton Ragland, [h. S.]”
The court decreed in favor of the plaintiffs, and directed Fanny and Lewis to be sold, for division; and from that decree this appeal was allowed.
In the report of the case in 3 Grattan, Fanny is not mentioned, but the bill of sale in which she was conveyed, and the deed from Ragland to Elizabeth Turner, were both before the court when they determined the character of the claim of Rag-land, and of the possession of Mrs. Turner, and decreed a full and perfect execution of the trust.
There is no evidence tending to prove that any part of the sum mentioned in the deed from Ragland to Elizabeth Turner, as the consideration, was paid by her. She was living at the time with her mother, and is not shewn either to have been of an age to have made such a purchase, or to have had the means of doing so, and the supposition that Ragland received anything is inconsistent with his constant and uniform declarations, that he held the slaves in trust for Mrs. Turner and her children; and his execution of this paper should be regarded as a part execution of that trust, with the consent of the mother, who was entitled for life; and Mrs. Elizabeth Turner should be regarded as holding Fanny as co-cestui que trust, and not as having acquired
any title by purchase from Ragland.
*The appellants have received their full share of the other slaves, and ought now to be made to account for Fanny and her son Lewis, and not be permitted to defeat the full and perfect execution of the trust, by alleging the fraud of an insolvent father against the other cestuis que trust. In Huston’s adm’r v. Cantril et als., 11 Leigh, 136, it was decided, that a husband and wife holding property by deed of gift to the wife, from her father before the marriage, were protected against an allegation of fraud, impeaching the deed, upon the' principle, that whatever might have been the original character of the conveyance, it was rendered good and available against creditors upon the marriage of the daughter, who thereupon was to be considered a purchaser by relation, for valuable consideration. I do not think tbe principle of that decision applies to this case. The appellees are not seeking to recover by an allegation of fraud in the title of the appellants in its origin, but the appellants are endeavoring to defeat the rights of their co-cestuis que trust, by alleging fraud in the creation of the trust, in the subject of which they have already participated.
If I am correct in the view of the case which has been taken, the statute of limitations furnishes no greater protection now than it did when the case was formerly before the Court of Appeals.
THOMPSON, J., delivered no opinion, but concurred with Judges Gilmer and Clopton in affirming the decree.
TYLER, j.
In 1806 Richard Turner conveyed, by an absolute bill of sale, two slaves, Lucy and her daughter Fanny, to Shelton Ragland, and immediately thereafter possession of the slaves was delivered to the grantee. This conveyance is proved by the appellees, who were plaintiffs in the court below, to have been made with the intent to defraud the creditors of the grantor. On the 12th of January, 1807, Turner executed *a bond to his fraudulent grantee (Ragland) for ten dollars, payable on the 1st of January, 1808, for the hire of Lucy for the year 1807. During that j'ear Turner died, and after his death Mrs. Turner, the widow of Richard Turner, retained possession of Lucy, either by an actual or sham hiring from Ragland. On the 1st of November, 1811, Ragland, the fraudulent grantee, transferred his right to the slave Fanny to Elizabeth Turner, by deed as follows:
“I do hereby relinquish my right to a negro girl Fanny to Elizabeth Turner, of the county of Caroline, for and in consideration of forty-five pounds, to me in hand paid. As witness my hand and seal, this 1st November, 1811.
“S. Ragland, [Seal.]”
There is not a particle of testimony in the record bearing upon this transaction ; and nothing is proved as to anything that was said or done, at the time of its execution or thereafter. The paper is proved in the cause; and it appears that previous to the death of Mrs. Frances Turner, which happened in 1834, Elizabeth Turner intermarried with John R. Turner, who are now the appellants, and that they have been in possession of the said slave Fanny, claiming her as their own property, from that period to the present time.
Mrs. Frances Turner, who had possession of Lucy and her increase, with the exception of Fanny, died in 1834, having made her will, by which she bequeathed those slaves that had been in her possession, and their increase, as her absolute property; and at her death John R. Turner, her executor (one of the appellants), took possession of them as the property of his testatrix. Wm. Turner and Campbell and wife then instituted a suit, in the circuit Superior Court of Law and Chancery for the county of Caroline, against Turner, the executor of Mrs. F. Turner, and his wife Elizabeth, claiming these slaves as the property of the children of Richard T-úrnéV, *and insisting that Mrs. Turner ha<K only a life-estate in the slaves, and that at her death they were to be divided among the children of Richard Turner. While the plaintiffs prove that this conveyance was in fraud of the creditors of Richard Turner, the grantor, they nevertheless insist, that there was a secret trust; and that by an understanding between the fraudulent grantor and grantee, the latter was to hold the property for the use and benefit of Turner’s widow for life, and after her death for the children. (Fanny, it *545 is to be remembered, was not claimed in this suit as one of the slaves belonging to the cestuis que trust.)
The executor of Trances Turner, answered this bill, and insisted that these slaves were the absolute property of his testatrix; denied all knowledge of the alleged secret trust, and in the progress of the cause exhibited the absolute conveyance from Richard Turner to Ragland, and also the deed of Ragland to his wife Elizabeth for the slave Fanny. Various depositions were taken in' the cause, and in April, 1839, the court below decreed that the slaves in controversy were the property of the children of Frances Turner, and that she only had a life-estate in the same. An opinion of the judge of the court below is in the record, and he bases his decree on two grounds: First, that the children of Richard Turner “are well entitled, notwithstanding the fraudulent purposes of the grantor of the grantee, to the performance of the trust,” and that as to .Ragland, the fraudulent grantee, he could not shelter himself from the trust, by reason of the fraud, and thus hold the property as his own. And again, because, from the evidence in the cause, the court was satisfied that the fraudulent grantee never claimed any title to the slaves, and as Mrs. F. Turner held as a beneficiary, it was not competent for her representative to set up a title adverse to her co-cestuis que trust, or co-beneficiaries.
The executor of F. Turner appealed from this decree of the Circuit Court, and the Court of Appeals affirmed the decree of the court below, as will be seen in 3 Grat. *77; but in so doing, while that court agrees with the court below in one view of the case, it takes care to repudiate the principle announced by the court below in another aspect of the case, to wit: that the fraudulent grantee could be compelled to a performance of the trust, and that he could not hold the slaves as his own, discharge of the trust. For it is declared by the Court of Appeals, that “if Ragland, the fraudulent grantee, had claimed title for his own benefit under the bill of sale from Turner to him, it would not have been competent, if the same was made to defraud creditors of the grantor, for the said Frances Turner and her children to set up, against the absolute title thereby conveyed, the secret trust attending the same in their favor.” Thereby announcing, that .Rag-land had the right to hold the property discharged of the trust, and, a fortiori, his alienee had an equal right to hold it discharged of the trust. The only question, then, would seem to be, whether Ragland had, as to any of these slaves, asserted title in his own right, and that question would seem to be answered by his deed to Elizabeth Turner, whereby, in consideration of ^4S, he relinquishes his right to Fanny to the said Elizabeth Turner.
The cause, however, was remanded to the court below, and on the 9th of September, 1846, an order was made directing certain commissioners to execute the decree of the 30th of April, 1839, to divide the slaves among the parties entitled, and to report.
When these commissioners proceeded to execute the decree, the slave Fanny (who was not one of the slaves in controversj’’ in the-suit) and Lewis (a son of hers born since Fanny had been sold by Ragland to Elizabeth Turner) were required to be surrendered for division. But the appellants, Turner and wife, refused to surrender them, claiming them as their own. The remaining slaves were then divided; and when the commissioners make their report, the appellees excepted to the report, because Fannjr and Lewis had not been divided with the rest. But the court below over-ruled the exception, *saying, that Fanny and Lewis were not comprehended in the terms of the former decree, and that no question, in regard to them, ought to be decided until an opportunity shall have been afforded of contesting the title, in some proper form of chancery proceeding, as by supplemental bill.
The appellees acquiesce in this order of the court, and file a supplemental bill, and set up the same title to Fanny and-Lewis as they had set up to Lucy and her increase in the original bill, and rely on the ground of the secret trust. The defendants, Turner and wife, answer, and assert their title to Fanny as derived from Ragland (by the deed of the 1st of November, 1811), the then owner of the slaves, and deny all knowledge of any secret or confidential trust. On the proofs then in the cause, the appellants were before the court as purchaser for valuable consideration, without notice of the trust. Under such circumstances, if Rag-land even could not have held tne property discharged from the trust, as between him and the cestuis quie trust, his alienee for value without notice, surely could have held it discharged from the trust. But it is not .necessary to place the defence on this high ground. If, as the Court of appeals has said, Ragland had the right to hold the slave Fanny, discharged from the trust, and he relinquished his right by deed to the appellant (E. Turner), whether with or without consideration or notice, his alienee must have had the same right. This is, as I understand, not controverted. What then is there in the case to explain, vary, contradict, or affect the conveyance from Rag-land to his alienee, Elizabeth Turner?
We have, it is true, the loose declarations of Ragland, the grantor, to the effect, at one time, that he never claimed these slaves as his own, and that he never appropriated, or intended to appropriate, them to his own benefit; and at another time a declaration affirming his grant to Elizabeth Turner, to wit: that he was the owner of Fanny; and finally, on his death-bed, that he had given up the slaves. But can it be said, *that these declarations of Ragland, the grantor, are to be used to nullify his solemn deed ! To contradict the solemn admissions therein made l Is property to be held by tenures like these? *546 and the breath, of the grantor be held sufficient to dissolve and set at naught his most deliberate and solemn contracts? And yet, to sustain this decree, we must either do this, or hold that a trust can be engrafted on a fraud; and that the aid of a court of conscience can be successfully invoked, by those claiming through the fraud, to have the trusts performed. All Ragland’s declarations, however, ma3r be made consistent with his deed, on the supposition that he executed the deed, delivered over the slave Fanny to his grantor, Elizabeth Turner, to place her on an equal footing with her sister, Mrs. Campbell, who had been advanced a slave named Aggy, by her father, Richard Turner.
If, however, these views (which seem to me to arise on the plainest and best settled principles of the law) should be supposed to be erroneous, why is it that the statute of limitations is not to avail the appellants in this suit? It has been decided in a branch of this case, as before remarked, 3 Grat. 77, that no trust was created which Ragland could be compelled to perform. If, then, the property was not impressed with the character of a trust, in the hands of Rag-land, and he parted with the property with or without consideration to his alienee, is that alienee to be converted into a trustee-under every and all circumstances; notwithstanding the appellants’ adverse claim of title and possession ever since 1834, the death of the life tenant, twelve years before the filing of the supplemental bill in March, 1847, and notwithstanding the adverse possession of the same parties for more than seven years after notice of their adverse claim of title was given to the ap-pellees by the appellants, by filing and proving in the original suit the title paper of Ragland for Fanny, and the deed from Rag-land to the appellants for the same slave? This claim thus publicly asserted, and in a mode which the appellees *were bound to notice, is acquiesced in for more than seven years before suit brought; and I have yet to learn, on what principle it is, that this case is withdrawn from the operation of the statute of limitations. It was said, it is true, that Ragland intended, when he conveyed the slave Fanny to E. Turner, to execute the trust quoad the slave Fanny, and to pass his right to her, which was in fact no right. But this is all mere conjecture, contradicted by Ragland’s solemn admissions by deed, that he intended no such thing; that the appellant, E. Turner, was his vendor for valuable consideration ; and she and her husband declare in their answer, on oath, that they had no knowledge of any secret or confidential trust. They are, .then, purchasers for valuable consideration without notice of any trust; and on the plainest principles of the law, are entitled to the slaves in controversy. With all due deference to the opinions of others, it seems to me, that by affirming the decree in this cause, I should be quitting the beaten path of the law, to roam in the boundless field of conjecture. I am, therefore, for reversing the decree, and dismissing the supplemental bill.
FIFED, P.
The statement made by Judge Tyler of the material facts of the case, is so full and accurate, that I shall not attempt to make, any addition thereto. I concur with him in the view he takes of the effect of the statute of limitations upon the question under consideration; indeed, I concur with him throughout, and intend only to present some additional reasons in support of his opinion. I will lay down two propositions, which I think can be established, either of which is, independently of the statute of limitations, fatal to the pretensions of the appellees.
1. That Elizabeth Turner, on the 1st of November, 1811, acquired of Shelton Rag-land, under his deed or written relinquishment under seal, as absolute title to Fanny, discharged from the secret trust.
There is sufficient in the record of the case that went *to the Court of Appeals, (3 Grat. 77,) and in the published opinion of that court, to sustain this proposition. In the opinion delivered by the judge in the Circuit Court, and set forth in the decree rendered, from which the appeal was taken, he said that the children of ■Richard Turner “are well entitled, notwithstanding the' fraudulent purposes of the grantor, or the grantee, for their benefit, to the performance of the trust. For, in regard to the grantor, it is a rule of law and equity, that he must lie down under the consequences of his own fraudulent conveyance; and. in regard t.o the grantee in trust, it is absurd to say that he shall shelter himself from the trust, which he has undertaken, by alleging his own fraud against Turner’s creditors, thereby claiming, as the fruits of his design, to cheat the children out of the benefits of the trust which he had undertaken for them, and thereby holding the property free from the claims of every body, and consequently holding it as his own.” If this extraordinary principle, so broadly laid down by the circuit judge, had been sustained and sanctioned by the supreme judicial tribunal in the State, it would follow, that in all cases where a man, to cheat and defraud his creditors, had conveyed to a trustee his whole estate, upon a secret trust, for the use of his wife and children, and the trustee took possession of the property, held it for his own use, and refused to execute the trust, the wife and children would have a right to sue the trustee in equity, and obtain a decree setting up the secret trust, and compelling the trustee to execute it, and bestow upon the wife and children the fruits of the grantor’s iniquitous designs, in violation of the policy of the law, which denounces all such fraudulent arrangements. The Court of Appeals were fully aware of the consequences which an affirmance of that principle by them might lead to, and being about to affirm the decree of the Circuit Court, they took care to remove all grounds to infer that in affirming the decree of the Circuit Court *547 they intended to sanction the reasoning- of the *judge, by entering, in effect, their protest against that reasoning, and making their protest a part of their entry. It is in these words: 1 ‘And the court is further of opinion, if the said Ragland had claimed title for his own benefit under the said bill of sale, it would not have been competent, if the same was made to defraud creditors of the grantor, for the said Frances and her children to have set up, against the absolute title thereby conveyed, a secret trust in their favor.” And the court might, with great propriety, have gone on further and said, nor can the children of the said Frances set that secret trust up against any one to whom Ragland may have conveyed his legal title to any of the slaves. This is in fact a corollary from what they did say. They say, “if the said Ragland had claimed title, ” &c. Now this very thing of claiming title is what Rag-land did do, when he made the deed of the 1st November, 1811, by which he conveyed his title to Fanny to Elizabeth Turner for the price of ¿£45. The making of that deed, ipso facto, was a claiming by Ragland of his absolute title to Fanny, and was a valid and full transfer of all his title to Fanny to Elizabeth Turner for valuable consideration. It is said that the conveyance to Elizabeth Turner was made without any consideration — that no money was paid. I care not what may be the truth of that fact. If Ragland could set up an absolute claim to the property, and defeat thereby the title of Mrs. Frances Turner and her children, under the secret trust, which the Court of Appeals has said he could have done., one incident or appendage to his transfer of title in Fanny to Elizabeth Turner, to say the least of it, was to invest her with the like privilege of setting up her absolute title, and thus to defeat the claim of the other children under the secret trust. This she could do, whether she had paid any money for Fanny or not. But on what ground is it, and from what source is the authority derived for saying, that the money was not paid? There is nothing in the testimony, or the record in this case, to warrant the assertion. On the contrary, *the record shews that the money was paid; for Ragland has, under his hand and seal, acknowledged the fact, that the money was paid. The appel-lees have not offered a particle of proof to the contrary, nor would they be allowed to do so, if they were full-handed with proof; for with what face could they (who are themselves mere volunteers, claiming as such through the fraudulent bill of sale to Ragland) ask leave to prove fraud and falsehood in Ragland, and that the appellants, like themselves, are mere volunteers, claiming title through the same fraudulent bill of sale?
But I shall not rely exclusively upon the opinion of the Court of Appeals, above referred to. I will go to the source from which they derived the principle. I will go to the case of Owen v. Sharp, 12 Leigh, 427, and the statement of that case will shew the analogy between the two cases. Waddy Thompson (Richard Turner) made a fraudulent bill of sale of a female slave (Eucy), absolute on its face, to Nicholas Owen (Shelton Ragland), in order to protect his property from his creditors, but there is a secret trust that the grantee shall hold the property for the benefit of the grantor’s daughters, (Mrs. Sarah Campbell and sisters) : Held, the daughters cannot establish the secret trust in equity, and have a decree for the slave, her increase and profits (Fanny and her issue.) This is the case of Owen v. Sharp, and the two cases are so exactly parallel to each other in every essential particular, that I am wholly at a loss to conceive why they are to be decided differently. At first view, it may seem to be strange in the Court of Appeals (the decision of Owen v. Sharp being in full view, and in which the opinion of the court was pronounced by the present President of the Court of Appeals) to affirm the decision of the Circuit Court as to the other negroes, instead of reversing the decree, and denying relief on the authority of Owen v. Sharp. According to the view taken of the case in the Court of Appeals, the two cases involved no inconsistency of decision. They stated, substantially, that if Ragland *had set up and claimed an absolute title to the slaves, that the title of Mrs. Frances Turner and her children would have been defeated. But they say that Ragland had not set up that title to the negroes involved in that controversy ; on the contrary, he had disclaimed all title for his own benefit; had permitted Mrs. Turner, in her life-time, to hold and enjoy the property in execution of the trust, remainder to her children; and the children after her death, shewing no title, except as co-cestuis que trust in remainder, could, as amongst themselves, enforce that title, and none of them would be allowed to defeat the full execution of the trust, nor to appropriate the exclusive benefit thereof to themselves. This may have been right, as to the negroes involved in that appeal. It was true that Ragland had claimed no title to them, except that as trustee, in part execution of the trust, he had delivered them up to Mrs. Frances Turner for life, remainder to her children; and therefore the court might have been well warranted in drawing a distinction between the two cases, and without being inconsistent, affirm the decree of the Circuit Court, and thus perfect the final execution of the trust, by letting ‘the negroes be divided amongst the children, although this were at last in furtherance of the original fraudulent design of the grantor. But suppose that Fanny and her increase had been involved in that appeal, what are we warranted to infer, from what they did say, would have been their opinion and decision as to Fanny and her increase? They would have said, that the title to Fanny and her children rested upon a very different ground; that Ragland had set up title to Fannjr, had conveyed her by *548 deed to Elizabeth Turner; that Elizabeth Turner held possession of, and had for many years been tl^e owner of, Eanny under that deed, during- the whole of which time her possession was adversary, and that they could not, therefore, without a direct and plain violation of the principle of Owen v. Sharp, permit the co-cestuis que trust to set up a claim to Eanny and her ^increase. These are the considerations X offer to sustain my first proposition.
My second proposition is, that John R. Turner’s title to Eanny was good and valid, not only against Ragland, Mrs. Erances Turner and her children, but against the creditors of Richard Turner, the grantor. It will be conceded by all that this property in the hands of Ragland, or in thé hands of Mrs. Erances Turner and her children, claiming as volunteers under the fraudulent bill of sale, would be liable to the claims of the creditors of Richard Turner, the grantor. But the claim of Turner is not the claim of a volunteer. It is the claim of a purchaser for valuable consideration without notice. That he is to be regarded as a purchaser for valuable consideration, and has title paramount to that of the creditors of Richard Turner, is put beyond all question oí doubt by the case of Huston’s adm’r v. Cantril et als., 11 Leigh, 136. A father owing a debt, at the time, makes a deed of gift of personal chattels to his infant daughter, which is duly recorded; she marries; the creditor files a bill against the daughter and her husband, impeaching the deed as fraudulent, and seeking ‘to subject the property to the payment of his demand. Held': Whatever might have been the character of the conveyance in its origin, it was rendered good and available against creditors, upon the marriage of the daughter, who therefore was to be considered a purchaser by relation for valuable consideration. Marriage, for ages past, has been regarded a valuable consideration, and has given validity to conveyances and settlements, contracts and arrangements, that may be counted by hundreds, which would otherwise have been held to be fraudulent and void as to creditors and purchasers. This being an established rule of law and equity, we will suppose this case: A creditor of Richard Turner brings two suits; one against the persons who got those negroes that were divided under the decree of the Circuit Court, affirmed by the Court of Appeals; the other, against John R. Turner; both suits Impeaching the bill of sale as fraudulent *upon creditors, and seeking to subject the negroes to sale, to satisfy his demand against Richard Turner. In the first suit, the plaintiff would recover, and those negroes which have been' already divided, under the decree of the circuit court, would be taken and sold, and the proceeds applied to the payment of the demand, because the holders of that part of the property hold it under the fraudulent bill of sale of their father, and were volunteers. But in the suit brought against John R. Turner, to subject the slave, Eanny, and, her increase, to the payment of the debt, the bill would be dismissed, upon the ground that John R, Turner must be regarded as the purchaser of Fanny for valuable consideration, and the equity in the two cases, of creditor and purchaser, being equal, the law must prevail. Then, let me ask, why is it that relief is to be refused to a creditor setting up a claim to Eanny, and in the next breath Eanny is to be surrendered to a mere volunteer claiming through a fraudulent deed? I will go a little further, and show a result even more inconsistent than this is. We say that the claim of the appellees is paramount to that of John R; Turner, and paramount to the claim of a creditor of Richard Turner, of course, because that had, in the case above supposed, been held to be inferior to Turner’s claim, and we make a decree under which Eanny and her issue are surrendered, and divided amongst the co-cestuis que trust. And now this same creditor brings a new suit, to have Eanny and her children surrendered and sold, to satisfy a balance remaining due of his debt. In this suit he would succeed with infallible certainty against those holding Eanny and her offspring, and they would be taken and sold to raise the amount due to this creditor ; and then how do these various cases appear, when grouped together and contrasted?
In the suit of the creditor against John R. Turner, we decide that Turner’s title is better than that of the creditor, and Turner holds Eanny.
In the children’s suit, we decide that their title is better than Turner’s, and then they recover Eanny.
*In the second suit brought by the creditor to recover Eanny, we say his claim, though inferior to the claim of Turner, is nevertheless better than the claim of the children (although the children’s claim had prevailed over Turner’s claim, which had prevailed over the creditor’s claim), and Fanny and her increase are now surrendered, to be sold to satisfy the very debt which it had been before decided they were not bound for.
The inconsistencies flowing from such decisions should need only to be stated to be condemned.
I should, therefore, be for reversing the decree, and dismissing the supplemental bill, but—
The decree of the Circuit Court in accordance with the opinion of JUDGES THOMPSON, CEOPTON and GIEMER, is to be affirmed, with costs.